THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROGER D. SMITH, Defendant-Appellant.

Fifth District   No. 5—91—0707

Opinion filed March 30, 1993.

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Barry Vaughan, State's Attorney, of Fairfield (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Roger D. Smith, was found guilty of two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, pars. 12—16(b), (c)(1)(i)) and sentenced to four years in the Department of Corrections. In this cause, defendant raises four issues: (1) whether defendant was proven guilty beyond a reasonable doubt; (2) whether defendant was denied effective assistance of counsel because defense counsel failed to file a motion to suppress inculpatory statements made by defendant; (3) whether defendant was denied effective assistance of counsel because of numerous alleged errors made during the course of trial; and (4) whether both convictions were based upon a single act requiring reversal of one conviction. We affirm in part and vacate in part.

## I

On February 5, 1991, defendant's wife, Tammy Smith, went to the Fairfield police department seeking a restraining order against defendant because defendant allegedly hit her. Smith signed a complaint against defendant for battery and ultimately received an order of protection. While at the police department, Smith informed police sergeant Jim McCleary she suspected that defendant sexually abused her son, age three. McCleary contacted the Department of Children and Family Services (the Department), and an investigation followed.

Defendant was interviewed by a Department caseworker, Belinda Hurley, at his home on April 8, 1991. At that time, defendant denied sexually abusing his stepson. Later that day, defendant was interviewed by Illinois State Police Trooper Craig Hansen at the Mt. Vernon police department. Belinda Hurley was also present during some of the interview. During this interview, defendant admitted to placing his mouth on his stepson's penis. After the interview, defendant was taken to the Fairfield police station and gave a third statement to Sergeant McCleary. At the Fairfield police department, defendant recanted the statement given earlier to Trooper Hansen. Defendant denied placing his mouth on his stepson's penis but admitted to fondling his stepson's penis on one occasion in November 1990, for approximately five minutes before giving his stepson a bath. Ultimately, defendant was charged with two counts of aggravated criminal sexual abuse. No motion was made to suppress defendant's statements.

At trial, the State called Belinda Hurley as its first witness. She testified that she received the initial report of abuse on February 6, 1991. She talked to the alleged victim. She also talked to defendant on the three occasions previously set forth. Initially, defendant denied any abuse toward his stepson. Defendant did say that his stepson saw Smith and him engage in sex and had begun mimicking that behavior. During the second interview, Trooper Hansen asked defendant if he placed his mouth on his stepson's penis, and defendant said "Yes." Defendant did not further describe the incident. During the third interview, defendant described a fondling incident which occurred when he gave his stepson a bath in November 1990.

Belinda Hurley further testified that no promises were made to defendant, but that she did tell defendant if he ever wanted to be reunited with Smith and his stepson, he would have to undergo counseling.

On cross-examination, Hurley testified that the victim told her that defendant had touched his penis but later would not say that it had been defendant. The defense attorney questioned Hurley about the procedures to be followed when an incident of abuse is reported to the Department. In this case, Hurley spoke to relatives and friends. Hurley discussed whom she interviewed and what they reported. Several hearsay statements were heard by the jury due to defense counsel's questioning. For example, Hurley testified that she interviewed Nicole Mason as part of her investigation. Nicole Mason told Hurley that she and the victim looked at a health book together, and the victim licked the penis on a photograph of a nude male model

and stated, "This is what Daddy does." The victim also pointed to photographs of other penises and said, "Don't touch me, I'm sore." Hurley further testified to statements made by Smith during the course of her investigation. For example, Smith told Hurley that the victim would look through magazines and lick the pictures of men's underwear. On one occasion, he licked the crotch area of a skeleton in a magazine. On another occasion, her son asked her to touch his penis, and when she refused to do so, he tried to place her hand on his penis. According to Hurley, Smith reported to her that she began noticing her son acting peculiarly two to three weeks before she reported the abuse. Additionally, the victim's baby-sitter told Smith that she suspected that he had been sexually abused. Smith told Hurley that she overheard her son ask someone to touch his "pee-wee." When she confronted her son about this, he said he got the idea from defendant.

Trooper Hansen testified that he interviewed defendant at the Mt. Vernon police department on April 8, 1991. Belinda Hurley was present during part of that interview. Hansen explained that defendant was not advised of his constitutional rights because he was not under arrest during the interview and was free to leave at any time. During the interview, defendant admitted that on one occasion he placed his mouth on the victim's penis.

Dawn Hunsinger, age 15, also testified for the State. She is friends with Smith and lived with her for several months when Smith and defendant were no longer living together. According to Hunsinger, defendant and Smith had a rocky relationship in which they would be together for a few months and then one would move out of the house. In February or March 1991, Hunsinger was looking through magazines with the victim, and he pointed out men's penises and rubbed them. Hunsinger pointed this out to Smith, who confronted defendant. Smith and defendant got into an argument, and defendant said the victim should know what a penis is. Defendant told Hunsinger that this was none of her business. Hunsinger also lived at various times with Mike Tiondi and Cathy Vaughn. Hunsinger testified that Smith and the victim also lived with Tiondi and Vaughn. On cross-examination, Hunsinger agreed that Tiondi and Vaughn were sexually expressive toward one another and admitted that she saw them simulate sex with one another (while fully clothed) in front of children, including the victim. Tiondi and Vaughn had a wide variety of sexually explicit magazines in their home. Hunsinger also stated that Nicole and Jason Mason simulated sex in front of children, including the victim.

Tammy Smith, age 20, testified that she has one child, the victim, and is married to defendant. They were married on January 9, 1990, but a divorce was pending at the time of trial. In February 1991, Smith filed a complaint against defendant with Sergeant Jim McCleary of the Fairfield police department. At that time, Smith wanted a restraining order against defendant. According to Smith, she confronted defendant as to whether he abused her son after Hunsinger told her about the victim's bizarre behavior while looking through magazines. Defendant denied any abuse. Smith testified that defendant assisted her in raising her son by bathing, dressing, and potty-training him. She testified that sometimes defendant touched her son's penis while helping him to urinate in a toilet. Smith denied ever seeing her son's genital area looking red or raw, although she did say the baby-sitter had told her that when she was changing his diaper, he complained that his penis was sore. Smith has asked that all charges against defendant be dropped.

On cross-examination, Smith testified that Cathy Vaughn kept Playgirl magazines in the house she shared with her and that the victim had access to them. Moreover, Vaughn and Tiondi would have sex without locking the door, and children, including the victim, could have walked in and watched them on several occasions. Jason and Nicole Mason were also sexually active around the victim. According to Smith, the Masons would simulate sex with each other, and afterwards Jason Mason would point out to the children living in the home that he had an erection. Smith stated that her son slept with her and defendant and that sometimes they would have sex, even while the victim was awake. According to Smith, her son first started exhibiting bizarre sexual behavior when she, defendant, and her son moved into a house with the Masons. Smith stated that when defendant noticed her son exhibiting sexual behavior, he would spank him and tell him not to do that. Smith testified that she still wants to be with defendant but filed for divorce because Belinda Hurley told her that if she did not her son would be taken away. According to Smith, Hurley promised that if defendant got counseling, the family could be reunited. Smith also stated that her son still has great affection for defendant.

Sergeant McCleary of the Fairfield police department testified that Smith filed a battery complaint against defendant on February 5, 1991. She also requested a restraining order at that time. She told McCleary that she moved away from defendant because she suspected that he was abusing her son. On April 8, 1991, Belinda Hurley telephoned McCleary and asked him to go by defendant's house to remind

him of a previously scheduled meeting with Hurley. Defendant was late for the meeting. When McCleary arrived, both defendant and Smith were present. Defendant explained that he wanted to go to the meeting, but that a window in his car was broken, and he was prevented from driving to the meeting because it was raining. McCleary offered to take defendant to see Hurley. Defendant agreed. McCleary dropped defendant off at the county line where Hurley was waiting to take him the rest of the way. Later in the afternoon, Hurley and defendant came back to the Fairfield police department where, although defendant was not under arrest, he was advised of his constitutional rights and signed a written waiver. A tape recording was made of the interview. Defendant recanted previous admissions made in Mt. Vernon. In a second tape, defendant made admissions of sexual abuse. The second tape was played for the jury.

Defendant took the stand in his own defense. He testified that the victim has been exposed to a wide variety of adult sexual conduct. Specifically, when defendant, Smith, and the victim lived with Tiondi and Vaughn, magazines containing pictures of naked men were available to the children. Vaughn and Tiondi frequently simulated intercourse with each other and even allowed the children into their bedroom to retrieve toys while they were having sex. The Masons also simulated sexual intercourse with each other in front of the children, after which Jason Mason would point out his erection to anyone nearby, including the victim. Defendant admitted that he and Smith would have sex while the victim was in bed with them and sometimes the victim woke up and saw them having sex, including oral sex.

Defendant testified that he assisted in caring for the victim and helped potty-train him. During potty-training, defendant often touched the victim's penis in order to help him aim it toward the toilet. Defendant and the victim also took baths together.

Defendant testified concerning the statements he gave to the Department and the police. During the first meeting with Hurley, defendant denied abusing his stepson. During the second interview at the Mt. Vernon police department, defendant admitted to placing his mouth on the victim's penis. According to defendant, the admission was false. He admitted to it only because Hurley told him that by doing so nothing would happen to him and he and Smith could stay together. Sergeant McCleary told him that while he could not make any promises about the punishment for such a crime, he could say that if he had abused his stepson, jail time would probably not be beneficial but counseling would. As to the third interview, defendant stated that the first tape made at that interview contained his explanation that

he felt pressured by the Department worker to admit to some type of abuse. In the second tape, defendant recanted his admission about putting his mouth on the victim's penis and instead admitted to fondling the victim's penis. Defendant explained he felt as though he had to admit to something in order to stay with Smith, and even though no abuse occurred, he thought fondling sounded less severe than placing his mouth on the victim's penis. Defendant admitted that he had been convicted of burglary when he was 18 years old and was sentenced to five years' probation.

Belinda Hurley testified in rebuttal for the State. According to Hurley, she discussed divorce proceedings with Smith only after Smith raised the subject. Hurley further testified that she talked to defendant about counseling on their way back from Mt. Vernon to Fairfield. This was after defendant made admissions of sexual abuse to Trooper Hansen. Hurley further testified that defendant told her that he needed and wanted counseling.

Ultimately, the jury convicted defendant on both counts of aggravated criminal sexual abuse. A post-trial motion, which was amended twice, was filed and heard on September 5, 1991. At that time, Smith testified she did complain to the police and to the Department that defendant sexually molested her son; however, after defendant was arrested, she told defendant's mother, father, and a woman named Tess Nelson that she lied when she accused defendant. A letter that Smith wrote to defendant while he was incarcerated on the current charges was introduced into evidence. In it, Smith stated that she lied about the allegations of sexual abuse. However, on cross-examination, Smith stated that she still believed that defendant sexually abused her son. Defendant's mother also testified at the hearing. She stated that she heard Smith admit that she lied about the allegations against defendant.

Defendant's post-trial motion was denied. A sentencing hearing was held, and defendant was sentenced to four years in the Department of Corrections. The court indicated that while defendant was being sentenced only on count I of the information, "the jury verdicts stand on both counts."

## II

The first issue we are asked to consider is whether defendant was proven guilty beyond a reasonable doubt. Defendant contends he was not because, exclusive of his admissions, there was no evidence to show that the victim was sexually abused by defendant. The State replies that defendant's admissions are adequately corroborated and the

jury's determination is supported by the evidence. We agree with the State.

In order to convict a defendant there must be sufficient evidence of the *corpus delicti* independent of a defendant's confession. (*People v. Webb* (1987), 153 Ill. App. 3d 1055, 1058, 506 N.E.2d 801, 803.) The *corpus delicti* of a crime is the body or substance of a crime, which ordinarily includes the act and the criminal agency. (Black's Law Dictionary 344 (6th ed. 1990); *People v. Lambert* (1984), 104 Ill. 2d 375, 378, 472 N.E.2d 427, 428.) Our supreme court stated in *Lambert* that in order to establish the *corpus delicti*:

> "There must be either some independent evidence or corroborating evidence outside of the confession which *tends* to establish that a crime occurred. [Citation.] If there is such evidence, and that evidence *tends* to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*." (Emphasis added.) (104 Ill. 2d at 378-79, 472 N.E.2d at 428-29.)

The test for basing a conviction on a confession is whether the independent evidence shows that a crime did in fact occur, although the evidence need not establish that fact beyond a reasonable doubt, and whether the evidence independent of the confession corroborates or bolsters the circumstances of the confession. *Webb*, 153 Ill. App. 3d at 1058, 506 N.E.2d at 803.

■ In this case, the record indicates defendant's confession that he fondled his stepson's penis was corroborated by the State's witnesses. The initial report of abuse was made by defendant's wife to Sergeant McCleary of the Fairfield police department. McCleary then called the Department hotline and reported the alleged abuse. The victim was interviewed by a Department investigator. On one occasion, the victim told the investigator that defendant touched his penis. The victim's baby-sitter told his mother she suspected that the victim had been sexually molested. Smith overheard her son ask someone to touch his "pee-wee" and was told by her son that he had gotten the idea from defendant. Several witnesses testified that the victim would touch and lick pictures of men's penises in books and magazines. We believe this evidence corroborates defendant's own statement that he fondled the victim's penis. This determination, that the fondling was established by evidence independent of the confession, was made by considering the State's evidence in light of the confession. (*Webb*, 153 Ill. App. 3d at 1059, 506 N.E.2d at 804.) Thus, we believe defendant was proven guilty beyond a reasonable doubt.

The second issue we are asked to address is whether defendant was denied effective assistance of counsel because defense counsel failed to file a motion to suppress inculpatory statements made by defendant. Defendant argues that the statements were not made voluntarily but instead were made in exchange for promises that defendant would receive psychiatric counseling, rather than jail time, and would be allowed to keep his family together. Defendant contends his trial counsel's failure to file a motion to suppress denied him effective assistance of counsel as guaranteed by the sixth amendment (U.S. Const., amend. VI). The State replies that the statements made by defendant were voluntary; consequently, any motion to suppress would have been denied and the outcome of the trial would not have been different. We agree.

Defense counsel is ineffective where his performance falls below an objective standard of reasonableness and there is a reasonable probability that, but for his performance, the result would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. (466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The reasonableness of counsel's actions must be determined in light of the totality of the circumstances. *People v. Atkins* (1987), 161 Ill. App. 3d 600, 515 N.E.2d 272.

■ Defendant first complains of his statement given at the Mt. Vernon police department. Specifically, defendant claims that he was interrogated by Trooper Hansen at the Mt. Vernon police department without the benefit of *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and thus, the lack of such warnings made the statement inherently unreliable, requiring its suppression. However, as the State points out, the *Miranda* rule applies to confessions obtained while a defendant is in custody or otherwise deprived of his freedom in some significant manner. (*People v. Hagar* (1987), 160 Ill. App. 3d 370, 513 N.E.2d 628.) The two-prong test to determine whether a defendant is in custody is (1) the intent of the officer, and (2) the understanding of the suspect. The understanding of the suspect is based upon an objective test of whether a reasonable person would believe that under the circumstances he was free to leave the scene of the interrogation or whether he was deprived of freedom in some other significant manner. 160 Ill. App. 3d at 373, 513 N.E.2d at 630.

Here, the facts show that defendant agreed to meet with Hurley for an interview in Mt. Vernon. When defendant did not appear, Hur-

ley contacted the Fairfield police department and asked Sergeant McCleary if he would go to defendant's home to see why he was late. Defendant did not have a telephone, so there was no other way to contact him. When McCleary arrived, defendant stated that he wanted to go to the meeting with Hurley but was prohibited from doing so because his car had a broken window and it was raining outside. McCleary volunteered to take defendant to meet with Hurley. Defendant accepted. McCleary drove defendant to the county line, and Hurley took him the rest of the way to Mt. Vernon. Trooper Hansen conducted the interview in Mt. Vernon. Hansen testified that he had no power to arrest defendant. Even after defendant made inculpatory statements, he was not placed under arrest but left with Hurley. Hansen stated it was customary practice to inform people he questioned that they were not in custody and were free to leave at any time. We believe a reasonable person under these same circumstances would believe that he was free to leave the scene of the interrogation and could request that the questioning stop. Therefore, we do not agree that defendant needed to be advised of his rights under *Miranda*.

Defendant also complains that the statements made by defendant at both the Fairfield police department and the Mt. Vernon police department should have been suppressed since they were not voluntary but the product of the promise of counseling, rather than jail time, and the promise to keep the family together.

The test of whether a statement is admissible at trial is whether it has been made freely, voluntarily, and without compulsion or inducement; the accused's will must not be overcome at the time of the confession. (*People v. Madden* (1986), 148 Ill. App. 3d 988, 996, 501 N.E.2d 1297, 1302.) Our review of the record shows that the statements were voluntary and not induced by promises.

The testimony at trial by the Department investigator and the police officers involved in the questioning of defendant show that no such promises were made. Defendant himself could not say that promises of no jail time were made. The statements made by the police officers and Hurley, which were complained of by defendant, are, in our judgment, mere admonishments to tell the truth. The parties urged defendant to confess and get help. We do not believe that such statements rendered defendant's confession inadmissible. (See *People v. Howard* (1985), 139 Ill. App. 3d 755, 487 N.E.2d 656.) Because we believe defendant's statements were admissible, we cannot agree that defense counsel was ineffective for failing to file a motion to suppress.

The third issue we are asked to consider is whether defendant was denied effective assistance of counsel because of numerous alleged errors made by defense counsel during the course of the trial. Specifically, defendant complains that his attorney was ineffective because he elicited improper and damaging testimony against defendant during cross-examination of the State's witnesses, failed to object to evidence and arguments that defendant had committed other bad acts, namely, placing his mouth on the victim's penis, failed to tender an instruction limiting the jury's consideration of such evidence, and failed to call witnesses who would have testified that Smith told them she fabricated the allegations against defendant. The State replies that the errors complained of by defendant were matters of trial strategy and thus are not subject to review by this court. We agree.

As previously pointed out, in order for a defendant to show that his counsel's representations fell below an objective standard of reasonableness, he must show that the results of the trial were unreliable and that, but for the attorney's unprofessional errors, the results would have been different. (*People v. Albanese* (1988), 125 Ill. 2d 100, 106, 531 N.E.2d 17, 19, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Under the first component of this two-prong test, a defendant must overcome a presumption that his counsel's conduct fell within a broad range of professional representation, and decisions regarding defense strategy made after a thorough investigation of the law and facts are not effectively challenged unless that strategy is found to be unsound. (*People v. Barrow* (1989), 133 Ill. 2d 226, 248, 549 N.E.2d 240, 249.) Defense counsel's decision to rely on one theory of defense to the exclusion of other theories is generally a matter of trial strategy (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 770, 445 N.E.2d 1213, 1218), so allegations arising from matters of judgment or defense counsel's trial strategy usually will not support a claim that counsel's representation was ineffective. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437, 381 N.E.2d 677, 685.) Competency is established by the totality of counsel's conduct at trial. 72 Ill. 2d at 437, 381 N.E.2d at 685.

■ It was defense counsel's theory throughout the instant case that the victim was not sexually abused by defendant but was raised in an environment where overt sexual activity was common, and while the victim's behavior was bizarre, he was merely imitating the sexual behavior he witnessed grown-ups engage in almost every day. During opening statements, defense counsel developed this theory:

> "I ask for you to listen very carefully to each aspect of the testimony that will be elicited today. I intend to cross-examine

extensively the law enforcement or state agency witnesses that the State will produce today and elicit from them how and under what circumstances Mr. Smith's statements were made. All I'm asking you to do is keep an open mind. I want you to understand the circumstances behind the investigation first starting, what happened after the investigation, up until today. I would anticipate that you're going to hear of a lifestyle that you're going to disagree with, a lifestyle that Mr. Roger Smith and his wife Tammy Smith engaged in, a life style that involves overt sexual activity in the presence of third parties, their own children, and other members of the populous, their friends. I expect for you all to hear about overt sexual activity in the presence of the children between third parties that aren't part of this situation, none of which sexual activity has any relationship to the charge at hand, except to show the circumstances under which [the victim] was brought up and reared for the formative years of his life to date and to explain to you why he would exhibit certain activities on his part that would cause someone to make a complaint about sexual, apparent sexual abuse. It is not a lifestyle that I expect that any one of you all are in agreement with or that you all ever had any intention of engaging in, but it does happen; it did happen in this case. I expect each and every one of you would be rather shocked about the whole circumstances, but in the end I expect each and every one of you to see that the State does not show that Roger Smith engaged in the activities which he's charged with. I would expect that each one of you would think that it is not a very particularly wonderful way to raise a child, but it is what happens and that's where we are today, but you are not here to find Mr. Roger Smith guilty of something that you don't approve of. Just because you don't approve of the behavior does not mean that you are to find him guilty. Just because you feel that this type of behavior should not be condoned and you should make a stand for what is right within the world, that is not your job here today. Your job here today and tomorrow perhaps is to determine whether Roger Smith committed the crime that he is accused of."

Moreover, defense counsel's cross-examination of State's witnesses was an attempt to show that the victim did indeed exhibit bizarre sexual behavior for a three-year-old and that such behavior was the result of being exposed to a different lifestyle than most, not the result of sexual molestation by defendant. Likewise, defense counsel's

failure to object to evidence and arguments that defendant committed other bad acts was also a matter of trial strategy. By not objecting to statements that defendant put his mouth on the victim's penis, defense counsel was able to elicit testimony to show that the victim had seen his mother and defendant engage in oral sex and was likely to have seen other grown-ups engage in such behavior. As the State points out, defendant was able to argue in closing that the fact defendant was not charged with placing his mouth on the victim's penis showed that even the State did not believe this evidence.

Finally, we cannot say that defense counsel was ineffective for failing to call witnesses to testify that Smith told them she lied about the allegations against defendant. There were witnesses, including defendant's mother, who could have testified to this, as shown in testimony taken at the hearing on defendant's post-trial motion and the sentencing hearing. However, a review of Smith's testimony at trial shows that it was not damaging to defendant and that Smith regretted making the allegations against defendant. She indicated she wanted the charges dropped. Calling these other witnesses would have served only to impeach Smith's testimony and failed to advance defense counsel's theory that the victim had learned this behavior from seeing others engage in sexual activity.

It is easy to second-guess a theory after a conviction, but having reviewed the record, we cannot say that defense counsel's theory was unsound. Defendant has failed to convince us that he was denied effective assistance of counsel.

■ The final issue we are asked to consider is whether both convictions were based upon a single act requiring reversal of one conviction. The State concedes that count II of the information must be vacated because both convictions were based upon a single act of abuse. Therefore, we need not address this issue.

For the foregoing reasons, the judgment of the circuit court of Wayne County on count I is affirmed, and the verdict entered on count II of the information is hereby vacated.

Affirmed in part; vacated in part.

WELCH and LEWIS, JJ., concur.